NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0392n.06

No. 23-3657

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Sep 19, 2024

KELLY L. STEPHENS, Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DAMARCUS BROWN,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

---

Before: WHITE, STRANCH, and DAVIS, Circuit Judges.

HELENE N. WHITE, Circuit Judge. Defendant-Appellant Damarcus Brown appeals the denial of his motion to suppress evidence that Akron police obtained during a traffic stop. Because police did not impermissibly extend the traffic stop and had probable cause to arrest Brown because he was driving without a valid license, we AFFIRM.

## I. Facts

At around 1:00 a.m. on May 5, 2021, Officers Guilmette and Mook initiated a traffic stop of the vehicle Brown was driving because the license plate did not match the vehicle's make and model. In Ohio, vehicle owners may use their old license plates on their new vehicle for up to thirty days, a fact the officers knew. Because his mother, Diann Pou, had purchased the vehicle on April 15, Brown's mismatching license plate was not in violation of Ohio law.

Officer Guilmette explained the reason for the stop and asked for the vehicle's paperwork. Brown responded that he had the paperwork and that the car was his mother's. Brown flipped

through papers from his glovebox to find the document showing that the vehicle was recently purchased. Brown also tried to call his mother so that she could confirm his assertions, but Guilmette told him to hang up the phone. As Brown sifted through his paperwork, Guilmette asked him if he had a driver's license. Brown said he did not, and Guilmette told Brown to exit the vehicle so that he could be placed under arrest. Before stepping out, Brown took off the satchel he was wearing and gave it to his passenger.

Once Brown was out of the vehicle, Guilmette searched him incident to his arrest and found two baggies in Brown's pockets—one with marijuana and another with white powder. Mook retrieved the satchel Brown had handed to his passenger, intending to search it. Guilmette asked whether there was anything in the car or satchel that he should know about, and Brown responded that there was a handgun in the satchel. Mook searched the satchel and found the firearm and additional drugs. After a few more minutes, Mook said "the VIN's all right," suggesting that the paperwork Brown produced had checked out. R. 37, PID 250-251.

Brown was indicted on four charges: (1) Felon in possession of a firearm, 18 U.S.C. § 922(g)(1); (2) possession of a firearm by a person with a domestic-violence conviction, 18 U.S.C. § 922(g)(9); (3) possession with intent to distribute a controlled substance, 21 U.S.C. § 841(a)(1); and (4) possession of a firearm in furtherance of a drug-trafficking offense, 18 U.S.C. § 924(c)(1)(A)(i). The indictment also contained a forfeiture provision. A superseding indictment added a charge of possession with intent to distribute methamphetamine. 21 U.S.C. § 841(a)(1).

Brown moved to suppress the evidence, arguing that the traffic stop was unlawfully extended, that there was no basis for his arrest, and that the accompanying searches violated the

2

Fourth Amendment.[1]  The district court held a suppression hearing and denied Brown's motion. The court reasoned in part that the arrest was constitutional because police were entitled to ask Brown for his license and registration and because driving without a license or with a suspended license is "an arrestable offense."  *Id.* at 275.  The court further concluded that the search of Brown's pockets was a "lawful search incident to arrest" and that the search of the satchel was justified because officers could search for contraband or weapons.  *Id.*

Pursuant to a written plea agreement that preserved Brown's right to appeal the denial of his motion to suppress, the district court sentenced Brown to sixty-one months of imprisonment. After the court's order denying his motion to suppress, Brown filed a motion to supplement the record with his driving record, which the court denied on the basis that it was an attempt to "introduce evidence retroactively."

## II. Analysis

### A. Standard of Review

When reviewing a district court's order denying a motion to suppress, we review findings of fact for clear error and questions of law de novo.  *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000).  A factual finding is clearly erroneous when, "although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999).  Where there is video evidence, we must view the facts "in the light depicted by the videotape."  *See Scott v. Harris*, 550 U.S. 372, 381 (2007).  Whether a seizure is reasonable is a question of law.  *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008).

---

[1] Brown also challenged the admission of his un-Mirandized statements during the traffic stop, but he does not repeat the challenge here.

**B. Scope of Detention**

Brown concedes that the officers had a reasonable basis to initiate the traffic stop because the license plate on the vehicle he was driving did not match the make and model of the car. Brown contends, however, that the traffic stop became unlawful when the police continued to detain him despite his producing paperwork showing that the vehicle complied with Ohio's vehicle-licensing laws.

**1. Constitutional Limits**

A traffic stop is a seizure within the meaning of the Fourth Amendment, "even if the purpose of the stop is limited and the resulting detention is quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Before initiating a traffic stop, police must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417–418 (1981)). An officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). To determine whether an officer's suspicion is reasonable, we consider the "totality of the circumstances," *Navarette*, 572 U.S. at 397 (quoting *Cortez*, 449 U.S. at 417), including "both the content of information possessed by police and its degree of reliability," *id.* (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Good faith alone on the part of police is insufficient to justify an intrusion. *See Terry*, 392 U.S. at 22. Instead, we use an "objective" standard: "[W]ould the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). "Anything less would invite

intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Id.* at 22.

Even when a traffic stop is legal at its inception, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "'Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed;' whichever comes first." *Hernandez v. Boles,* 949 F.3d 251, 256 (6th Cir. 2020) (quoting *Rodriguez v. United States*, 575 U.S. 348, 349 (2015)). A traffic stop "becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission" of the stop. *Rodriguez*, 575 U.S. at 350 (brackets omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). In assessing whether the length of a seizure is unreasonable, we consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Because there is no "de minimis" exception to this rule, even incremental extensions beyond the time reasonably necessary to complete a traffic stop are unlawful. *Rodriguez*, 575 U.S. at 356–57.

The Constitution also places limits on the scope of a detention, not just its duration. During a traffic stop, officers must use "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. Thus, a detention can become unlawful where the "scope of the detention [is not] carefully tailored to its underlying justification." *Id.* "Even minor police actions aimed at 'detecting evidence of ordinary criminal wrongdoing' or any purpose beyond addressing the traffic infraction are not tasks incident to the stop." *United States v. Lott*, 954 F.3d 919, 924 (6th Cir. 2020) (quoting *Rodriguez*, 575 U.S. at 355).

Brown relies heavily on *State v. Chatton*, 463 N.E.2d 1237 (Ohio 1984) (per curiam), a case he contends has facts very similar to those we consider today. In that case, an officer initiated a traffic stop because Chatton's vehicle appeared to have no license plate. *Id.* at 1237. As the officer approached Chatton's vehicle, he noticed that there was a temporary license plate lying right below the rear window, a fact that dispelled any reasonable suspicion justifying the stop. *Id.* Still, the officer continued to the driver-side window and asked Chatton for his driver's license, which he produced. *Id.* After running a computer check, the officer learned that Chatton's license was suspended. *Id.* The officer arrested Chatton and searched his vehicle, discovering a handgun. *Id.* at 1238. Chatton was indicted for carrying a concealed weapon. *Id.*

The *Chatton* court explained that the initial stop was legal because the officer had "specific and articulable facts" to justify his reasonable suspicion—the absence of a license plate on the vehicle. *Id.* at 1239 (*quoting Terry*, 392 U.S. at 21–22). However, the basis justifying Chatton's detention was extinguished once the officer saw the temporary plate. *Id.* at 1240. At that point, the officer could no longer maintain a reasonable suspicion that Chatton was violating the law. *Id.* Consequently, any further detention of Chatton was unreasonable because the officer lacked any basis to detain him. *Id.*; *see also Prouse*, 440 U.S. at 661 (holding that asking a driver to produce their driver's license is unlawful "[w]hen there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations—or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered").

## 2. Brown's Detention

*Chatton*'s analysis is helpful in examining the circumstances of Brown's traffic stop. Like in *Chatton*, the "purpose" or "mission" of the stop here was to investigate whether Brown's vehicle

was operating in violation of the state's vehicle-licensing laws. *Id.* at 170, 196. Thus, the officers had a duty to use the "least intrusive means reasonably available to verify or dispel" the theory that Brown's vehicle was improperly licensed. *Royer*, 460 U.S. at 500. This case might be analogous to *Chatton* had Brown produced the exculpatory paperwork immediately after he was pulled over and nevertheless had his detention extended. But that is not what occurred. Footage from the traffic stop shows Brown fumbling around for over a minute to find the correct paperwork, at which point Guilmette asked Brown whether he had a driver's license. Leading up to this point, Guilmette had acted diligently—he had not done anything to extend the traffic stop longer than necessary to effectuate its purpose. Brown would have taken equally long to find his documents whether Guilmette had asked the question or not. This case is thus different from *Chatton*, where the officer extended the stop beyond the time necessary to dispel reasonable suspicion. Here, Guilmette's question did not unlawfully extend the duration of the traffic stop in any way.

Nor did Guilmette's inquiry impermissibly expand the scope of the stop. When officers have reasonable suspicion of a traffic violation, they may carry out "ordinary inquiries incident to the traffic stop." *Rodriguez*, 575 U.S. at 355 (brackets omitted) (quoting *Caballes*, 543 U.S. at 408). This may include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* We applied this principle in *Lott*, holding that an officer did not unconstitutionally expand the scope of a traffic stop when he spent a few minutes running a warrant check on a driver who was pulled over for a left-lane infraction. 954 F.3d at 924-25. These cases make clear that Guilmette could ask for Brown's driver's license during the traffic stop because, at the time of the request, he had reasonable suspicion that Brown had committed a traffic offense.

7

## C. Legality of Arrest

Police must have probable cause before making a warrantless arrest. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964). In determining whether probable cause existed, we examine whether, at the moment of arrest, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Id.*

Guilmette testified that he intended to arrest Brown for violating Akron's prohibition against driving with a suspended license. Under the Akron municipal code, it is a first-degree misdemeanor—and thus an arrestable offense—for a person whose driver's license "has been suspended" to "operate any motor vehicle . . . during the period of the suspension." Akron, Ohio, Mun. Code §§ 71.01(A)(1), (F)(1); *see id.* § 10.99(D)(1).

The government argues that there was probable cause to believe that Brown was operating a vehicle on a suspended license. However, the only supporting evidence police had at the time was Brown's statement that he did not have a driver's license. Guilmette did not ask to see Brown's ID—which would have made clear whether Brown had obtained a license in the first place—and did not look up Brown's name in the LEADS system, which would have shown whether Brown had a suspension. At the suppression hearing, Guilmette confirmed that he had not investigated whether Brown was under any license suspension. Because Guilmette had almost no evidence at the time suggesting that Brown's license was suspended, Brown argues that there was no probable cause to believe he had violated Section 71.07 at the time of his arrest.

Brown argues that a different provision of the Akron municipal code applied to him—the prohibition against operating a vehicle without a driver's license in Section 71.01. Brown contends

that, unlike Section 71.07, a violation of Section 71.01 is a minor misdemeanor, for which police cannot make an arrest. But Brown overstates Section 71.01.[2]

That section states only that the minor-misdemeanor penalty applies to an individual who "operat[es] a motor vehicle when his driver's . . . license has been expired for no more than six months." *Id.* at 71.01(C). Relevant here, the penalty for driving without ever obtaining a license—Brown's circumstances here—is unstated. However, Section 71.99, a catchall provision, states that "[w]hoever violates any provision of this chapter for which another penalty is not provided shall be guilty of a misdemeanor of the first degree." Accordingly, as the district court concluded, a reasonable officer would have had probable cause to arrest Brown for driving without a license.[3]

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's order denying Brown's motion to suppress.

---

[2] We acknowledge that the prosecution did not dispute Brown's reading of Section 71.01 in its brief. And Guilmette gave contradictory testimony at the suppression hearing regarding the consequences of driving without a license. At the suppression hearing, Guilmette testified that driving without having acquired a license was not an arrestable offense, and that if Brown did not have a license suspension, he "was not properly being arrested." R. 37, PID 206; *id.* at PID 205 ("I believe if . . . you've never had [a license] issued to you, I don't believe that's an M1 arrestable offense, but driving under a suspended license is."). But Guilmette also testified that he routinely arrested anyone driving without a valid license, that "[d]riving without a license" is a "per se arrestable offense under the Akron City Code," and that "[i]t doesn't matter why you don't have a license." *Id.* at 204–06.

[3] Once officers had probable cause to arrest Brown, they were permitted to conduct the search incident to arrest that produced narcotics in his pockets. *See Chimel v. California*, 395 U.S. 752, 762–63 (1969). And once Brown informed them that he had a weapon in the car—a statement Brown has not argued on appeal was elicited in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966)—they had probable cause to search his satchel. *See Arizona v. Gant*, 556 U.S. 332, 347 (2009) (citing *United States v. Ross*, 456 U.S. 798, 820–821 (1982)).